OPINION
{¶ 1} Plaintiffs-appellants, Russell and Marsha Bowling, appeal from a judgment of the Franklin County Court of Common Pleas granting the motion for relief from judgment of defendant-appellee, Kemper Insurance Companies ("Kemper"). Plaintiffs assign a single error:
The Trial Court Erred to the Substantial Prejudice of Plaintiffs-Appellants in Granting Defendant-Appellee's Motion for Relief from Judgment, Because the Defendant-Appellee Failed to Show That Its Neglect in Failing to Timely Answer Should Be Excused.
Because Kemper was properly served, and the evidence does not support the trial court's finding excusable neglect, we reverse.
 {¶ 2} Plaintiffs filed a lawsuit against Kemper for breach of contract, alleging that Kemper improperly denied plaintiffs uninsured/underinsured ("UM/UIM") benefits. Kemper failed to timely file an answer to the complaint, and plaintiffs moved for a default judgment; the trial court granted the motion. After Kemper received notice of the default judgment entry, it filed a motion to vacate the judgment for lack of personal jurisdiction due to failure of service, or, in the alternative, a motion for relief from judgment pursuant to Civ.R. 60(B). In a decision and entry dated December 27, 2004, the trial court granted Kemper's motion and set aside the default judgment.
 {¶ 3} Plaintiffs' complaint, filed against Kemper on November 22, 2002, was served on Kemper on December 10, 2002, by certified mail directed to Kemper's office at 500 West Madison Street in Chicago, Illinois. Once Kemper received the trial court's entry granting default judgment against it, Kemper conducted an investigation in an attempt to determine if it was properly served. Because the facts surrounding service of the complaint in this case are pivotal to the analysis we must perform in determining the merits of plaintiffs' appeal, we set forth in some detail the facts presented to the trial court.
 {¶ 4} During the relevant time period, the tenants of 500 West Madison, including Kemper, had in place a contract with Arrow Messenger Service ("Arrow") to act as the building's messenger service. As part of such services, Arrow picked up mail from the post office and delivered it to Kemper, as well as the other tenants.
 {¶ 5} Brenda Brown, Arrow's director of operations in December 2002, averred that, since at least August 1, 1997, the date of the contract in effect when she arrived in 1999, Arrow has picked up and delivered both ordinary and certified mail addressed to Kemper. Brown testified the mail was delivered to Kemper's mailroom pursuant to the postal service's "Standing Delivery Order" form Kemper signed that allowed Arrow to pick up both ordinary and certified mail and, specifically, to sign for Kemper's certified mail. According to Brown, the postal service does not allow Arrow to pick up mail for anyone unless the proper authorization form is on file. Brown further stated she is unaware of any incorrect deliveries during her tenure involving 500 West Madison tenants.
 {¶ 6} At the time of his deposition, Gordon Winson, an employee of Arrow, had been delivering mail to 500 West Madison for over two years. Winson testified the post office clerks both knew him and knew that he and Bobby Jones, another Arrow employee, sign for and deliver certified mail to 500 West Madison tenants on a daily basis. At the time of the complaint at issue, the post office maintained a signature card with Winson's signature on it. Winson testified that he and Jones met at the post office each morning; whoever arrived first signed for the certified mail that day. Winson testified the post office clerk removed the green cards from the pieces of certified mail before he or Jones signed them. Winson had no knowledge of the actual piece of mail that corresponds to the green card.
 {¶ 7} According to Winson, after receiving the mail for 500 West Madison, he and Jones loaded the mail bins onto a delivery truck. Winson and Jones then transported the mail bins to the loading dock at 500 West Madison, where they unloaded the mail bins onto the dock and placed the certified mail into the appropriate tenant's bins. After sorting the mail, they put the bins into gurneys, transported the gurneys onto the freight elevator, and delivered the mail to the designated tenants of 500 West Madison. Winson testified that he and Jones delivered Kemper's mail, ordinary and certified, to the 11th floor mailroom by placing the bins just outside the freight elevator. Kemper's mailroom employees retrieved the mail and began sorting and forwarding the mail to the appropriate individuals.
 {¶ 8} On the morning of December 10, 2002, Winson met Bobby Jones at the post office. Winson arrived first and, accordingly, he signed the certified mail delivery receipt cards for 500 West Madison tenants, including Kemper. Winson signed his name as "G. Wins" to save time. There is no dispute that Winson is the "G. Wins" who signed the return receipt for the complaint and summons at issue. Winson testified that, after signing the cards, he and Jones followed their normal daily procedure and delivered the mail to 500 West Madison and, specifically, to Kemper. Winson has no independent recollection of delivering the piece of certified mail at issue, but testified that he followed his normal procedure for delivery that day.
 {¶ 9} Both Winson and Jones are required to keep daily "manifest" sheets evidencing their deliveries. Both Winson's and Jones' manifest sheets demonstrated they made the mail deliveries to 500 West Madison on December 10, 2002. Although no signature is on the manifest sheet for the line applicable to 500 West Madison, Winson testified they do not obtain signatures there because "[t]hat's just a standard job, that we pick up and deliver to 500 West Madison. There's nobody to sign for us there." (Winson Tr., at 37.) When questioned whether it was "possible that this piece of mail could have gotten rerouted, the one that they're interested in," Winson replied, "[m]y first answer would be I would say no; but as we know, anything is possible. * * * But for Kemper, like I say, they had their own mail room, so the mail — to the best of my understanding and my procedure and my job, that it would have got there." (Winson Tr., at 59.) Winson further stated, "if the post office gave it to me, you know, I picked it up and I delivered it. That's like the daily procedures." (Winson Tr., at 48.) Winson did not know of the post office ever making a mistake.
 {¶ 10} Gregory Jones, a Branch Operations Manager for Kemper, was in charge of Kemper's office at 500 West Madison. Theresa Davenport was the Operations Supervisor; she supervised the mailroom employees and receptionist. At the time of their depositions in October 2003, Jones and Davenport had been in charge of that office for approximately one year. Both Jones and Davenport testified that they are the most knowledgeable individuals regarding delivery of mail to Kemper's 500 West Madison office. According to them, Kemper became aware of the lawsuit when it received the default judgment entry. In an attempt to find out what happened to the complaint and determine whether Kemper indeed had been served, Jones testified that he and Davenport conducted a thorough investigation into the mail procedures.
 {¶ 11} According to Jones and Davenport, post office employees directly delivered all of Kemper's mail, including certified mail, to the receptionist, Tina Comeaux. Jones and Davenport testified that Kemper's procedure with regard to certified mail was that, if the certified mail was addressed to a specific individual at Kemper, Comeaux was to call the individual to the reception desk and have the person sign for the mail. If, however, the certified mail was addressed to Kemper generally, Comeaux signed for it and forwarded it to Jones.
 {¶ 12} Both Jones and Davenport were unaware that Kemper utilized any messenger service, including Arrow, on a regular basis to pick up mail from the post office; neither of them recognized the name Gordon Winson or "G. Wins." Jones testified the procedure for dealing with legal service of process was already in place when he became Branch Operations Director; he did not know who set up that procedure. Jones acknowledged that Kemper did not have a written procedure in place to handle certified mail or legal service of process, that Kemper did not track or keep a record of legal service of process, and that he had no knowledge of any training Comeaux received regarding how to handle legal service of process. Davenport, by contrast, testified Jones set up the policy for legal service of process. Davenport stated that although she believed Kemper had a procedure for handling legal service of process, she never had any specific training regarding it, she was not given any training on how to direct the mailroom employees, and she was unaware if Comeaux received any such training.
 {¶ 13} According to Comeaux, she received all of Kemper's mail, except larger packages that were delivered through the freight elevators. Comeaux testified certified mail went to her, and she signed for it. If she was not at her desk, a temporary receptionist could receive it, or the delivery "could have went to the mail room." (Comeaux Tr. at 16.) Further, if certified mail was addressed to Kemper generally, as opposed to a specific individual, she sent it to the mailroom; contrary to the belief of Jones and Davenport, she did not forward it to Jones. If, however, the certified mail was addressed to a specific individual, Comeaux would sign for it and call that individual; the individual would then sign a sheet indicating receipt from Comeaux.
 {¶ 14} Comeaux testified that for every item she signed, she gave a copy of the signature slip to the mailroom; the mailroom "kept copies of everything that anybody signed for." (Comeaux Tr., at 26.) Comeaux acknowledged Kemper's use of "several" messengers that came on a daily basis. Comeaux testified that if Winson picked up the mail from the post office, including certified mail, and delivered it directly to the mailroom, he was in violation of Kemper's procedure because all mail went through her.
 {¶ 15} With respect to legal service of process, Comeaux testified that she was not given any training as to what a lawsuit looked like or what to do with it upon receipt. In any event, because she did not open any envelopes to determine the contents, she would not be aware that a particular envelope contained a legal complaint. According to Comeaux, "[a]s far as me being trained for just lawsuits period, I have not been. I was trained how to handle mail with the name and without the name period, whether it was a lawsuit, flowers or candies. They were all treated equally." (Comeaux Tr., at 29.) Although Comeaux does not recall receiving either any piece of mail that already had a signature on it or the certified mail at issue, she stated she likely would not remember a piece of mail not addressed to a particular individual.
 {¶ 16} Timothy Maeder was employed in Kemper's mailroom beginning in October 2001. Mary Arola initially was his immediate supervisor, but in October 2002 Davenport became his supervisor. In an affidavit, Maeder averred that if he had received certified mail addressed to Kemper with the green card removed, he would have opened it, keeping the envelope attached, to determine if a specific name was indicated inside. Had the envelope contained a lawsuit, he would have asked Davenport where to send it.
 {¶ 17} During his deposition, Maeder testified he received hands on training from a co-worker who had been at Kemper approximately six months at the time. Maeder recalled being trained about how to handle certified mail but could not recall any specifics other than if he encountered mail with the green card removed, he knew to pass it on to "someone." (Maeder Tr., at 15, 17.) Maeder testified that if he had a question regarding where he should send certified mail, he asked Davenport. Maeder did not recall anyone teaching him the difference between certified and restricted mail.
 {¶ 18} Maeder stated Kemper had no policy or procedure manual for the mailroom, no set procedure requiring that all certified mail go to the same place, and no mailroom log of incoming certified mail. He further testified he was never told that the receptionist should receive all mail. In response to being asked whether he "would have nothing to go back and look at to determine whether you had received this complaint or not," Maeder replied, "[t]hat's correct." (Maeder Tr., at 22.)
 {¶ 19} Maeder testified the mail was delivered to Kemper through a freight elevator; the delivery men put the mail in buckets next to the elevator on the 11th floor. According to Maeder, the green cards were always removed from the certified mail envelopes when the mailroom received them. Maeder did not recall Davenport or Jones ever coming to him to find out why any green cards were removed. Maeder never questioned the men who dropped off the mail about the absence of green cards on the certified mail. Although Maeder believed the men who dropped off the mail were post office employees, he testified they wore yellow shirts and not the typical bluish gray postal service uniforms. If the mailroom received a piece of mail that was not addressed to Kemper, Maeder stated he would use his best efforts to get the mail to the intended recipient; he would never throw the mail away because he believed that to be illegal.
 {¶ 20} Maeder further testified that when he stated in his affidavit that he received mail from the receptionist, he meant only packages from Federal Express, United Parcel Service and "DHL." Maeder stated the receptionist would sign for the packages, and he retrieved the packages from her desk. Maeder does not recall receiving the complaint and summons at issue but stated he would not likely recall any specific mail.
 {¶ 21} Mary Arola, Davenport's predecessor, testified that Comeaux was or should have been trained regarding certified mail and, in particular, legal service of process. Arola stated that, if a lawsuit were delivered to Comeaux's desk, Comeaux was to forward it to Human Resources, a manager, or the executive secretary. Arola testified that, if Jones received the complaint, he was to forward it to Kemper's corporate office in Long Grove, Illinois.
 {¶ 22} Arola acknowledged Kemper's relationship with Arrow and several other messenger services. Consistent with Winson's and Maeder's testimony, Arola testified that, if certified mail were signed for at the post office and the green cards were removed, mail went directly to the mailroom, not the receptionist. Arola, however, was unaware that, since 1994, an Arrow employee was signing for Kemper's incoming certified mail at the post office. Instead, Arola testified that no one from Arrow was authorized to sign for Kemper's certified mail, stating that "[a]ny mail that would be signed for, I do not believe we would have authorized a vendor to sign on behalf of Kemper." (Arola Tr. at 25.)
 {¶ 23} Contrary to her testimony, Arola signed two "Standard Delivery Orders," one was dated July 7, 1994 and the other dated July 14, 1994; the building manager at 500 West Madison kept copies of the authorization forms. The form dated July 7, 1994 does not authorize anyone to sign for "restricted mail" but the subsequent form dated July 14, 1994 contains no such restrictions. Arola apparently understood restricted mail to mean any mail that required a signature and thus necessarily included certified mail requiring a signature. As described on the post office's website, restricted mail ensures the mail is delivered only to the person specified or, alternatively, to the person authorized in writing to sign for the specified recipient. Certified mail ensures that the mail arrives at its intended destination and may or may not require a signature, depending on the sender's preference.
 {¶ 24} Within those factual parameters we first address Kemper's argument that Kemper is an improper defendant. Specifically, Kemper claims that because Lumbermen's Mutual Casualty Company ("Lumbermen's"), not Kemper, issued the insurance policy at issue in the underlying lawsuit, Kemper is not the proper defendant.
 {¶ 25} Kemper is the registered trade name for Lumbermen's, as well as several other insurance carriers. The policy issued to Russell Bowling's employer was attached to the complaint, and it contains Kemper's name on the declarations page and throughout the policy. Indeed, Kemper's front desk policy dealing with "Packages, Airline Tickets And Visitors" states the following in regard to packages: "Before accepting them, verify that all packages or airline tickets are addressed to Kemper, Kemper employees, Lumbermen's Mutual." Given those facts, Kemper cannot seriously maintain it was not put on notice of the lawsuit because plaintiffs' complaint names Kemper, not Lumbermen's, as the defendant. Because Lumbermen's uses the names almost interchangeably, plaintiffs' complaint is not lacking for having used Lumbermen's trade name, Kemper. Cf. Family Medicine Foundation, Inc. v. Bright, 96 Ohio St.3d 183,2002-Ohio-4034.
 {¶ 26} Kemper next asserts that it never received valid service of process. In the trial court, Kemper moved to vacate the default judgment for lack of personal jurisdiction due to ineffective service of process or, in the alternative, for relief from judgment under Civ.R. 60(B). The trial court's decision focused on Civ.R. 60(B) and provided relief from the default judgment on the basis of excusable neglect. Because proper service of process is needed before a trial court can render a valid default judgment, we address that issue first. Westmoreland v. ValleyHomes Corp. (1975), 42 Ohio St.2d 291.
 {¶ 27} A trial court lacks jurisdiction to render a judgment against a defendant if effective service of process has not been made on the defendant and the defendant has not appeared in the case or waived service. Rite Rug Co., Inc. v. Wilson (1995), 106 Ohio App.3d 59, 62. If service is defective, a subsequent default judgment is void.Neiswinter v. Nationwide Mut. Fire Ins. Co., Summit App. No. 21691, 2004-Ohio-3943, citing State ex rel. Ballard v. O'Donnell (1990),50 Ohio St.3d 182. When a party challenges whether service was proper or effective, the court is "guided by the premise that service is proper where the civil rules on service are followed, unless sufficient evidence exists to rebut this principle." Id., citing Grant v. Ivy (1980),69 Ohio App.2d 40. In addition to compliance with the civil rules, due process requires that service of process be accomplished in a manner that is reasonably calculated to apprise the interested parties of the action and give them an opportunity to appear. Jones v. Frank Bomholt Sons,
Highland App. No. 01CA9, 2002-Ohio-6138, quoting Samson Sales, Inc. v.Honeywell, Inc. (1981), 66 Ohio St.2d 290.
 {¶ 28} Kemper insists the evidence is uncontroverted regarding lack of service, as no employee recalls receiving plaintiffs' complaint and summons. Kemper argues that, where a party makes an uncontradicted sworn statement that it never received service of a complaint and summons, the party is entitled to have a default judgment set aside even if the plaintiff complied with the civil rules by having the complaint served at an address where the defendant could reasonably be anticipated to receive it. Rafalski v. Oates (1984), 17 Ohio App.3d 65; Rogers v. UnitedPresidential Life Ins. Co. (1987), 36 Ohio App.3d 126. In accordance with that line of cases, this court recently held that a defendant was not effectively served where the defendant's estranged husband signed the certified mail return receipt but failed to open the mail or give it to the defendant. TCC Management, Inc. v. Clapp, Franklin App. No. 05AP-42, 2005-Ohio-4357. Because the defendant's uncontested affidavit stated she never received service, and her husband's uncontested affidavit averred that he never gave defendant the certified mail, no service was established. Id.
 {¶ 29} The cases Kemper cites, however, are not dispositive of the issue before us. Civ.R. 4.2(F) provides that service of process upon a corporation may be made "by serving the agent authorized by appointment or by law to receive service of process; or by serving the corporation by certified or express mail at any of its usual places of business; or by serving an officer or a managing or general agent of the corporation[.]" A plaintiff thus is not required to serve a corporation at a particular office, as long as service meets the requirements of the civil rules and due process.
 {¶ 30} Here, plaintiffs sent the complaint and summons by certified mail to one of Kemper's usual places of business, and, due to the authorization Kemper gave Arrow to sign for and retrieve its certified mail, an authorized agent signed for and returned the certified mail receipt. Although Kemper attempts to circumvent the Arrow authorization form by arguing that Arola was confused about what constituted restricted mail, the clear language of the form, in addition to Arrow's practice since approximately 1994, establish that Arrow agents, including Winson and Jones, were authorized to pick up and sign for Kemper's certified mail.
 {¶ 31} Because an authorized agent signed for and returned the certified receipt, service was accomplished. Even if, however, we assume that the signed receipt creates only a presumption of valid service, Kemper's argument fails.
 {¶ 32} Service of process upon a corporation at an address reasonably anticipated to reach the intended recipient is effective, provided the certified mail receipt is signed and returned, even if it is not delivered to the defendant or a person authorized to receive service of process. Honeywell, supra; T.S. Expediting Servs., Inc. v. Mexican Ind.,Inc., Wood App. No. WD-01-060, 2002-Ohio-2268 (holding service was valid even though a truck driver signed the certified mail receipt at defendant's warehouse site because, even though the defendant argued the driver was not an authorized agent, the court found service sufficient as long as the receipt was signed by a person at one of the named defendant's places of business). Cf. New Co-Operative Co. v. LiquorControl Comm., Franklin App. No. 01AP-1124, 2002-Ohio-2244 (stating that valid service is presumed when notice is sent by certified mail, return receipt requested, and thereafter a signed receipt is returned, even though the recipient is not an agent of the defendant); Heather Hill,Inc. v. Howes, Geauga App. No. 2001-G-2402, 2002-Ohio-6931.
 {¶ 33} Under those parameters, Kemper has failed to present sufficient evidence of non-service to rebut the presumption. New Co-Operative Co.,
supra. In determining whether a defendant has sufficiently rebutted the presumption of valid service, a trial court may assess the credibility and competency of the submitted evidence demonstrating non-service. Clapp,
supra. A trial court is not required to "give preclusive effect to a movant's sworn statement that she did not receive service of process when the record contains no indication that service was ineffectual." Id. at ¶ 3; Oxley v. Zacks (Sept. 29, 2000), Franklin App. No. 00AP-247.
 {¶ 34} Here, the complaint was sent certified mail in accordance with the civil rules, it arrived at the post office, and Winson, an agent specifically authorized by Kemper to sign for and receive Kemper's certified mail, signed for it. Winson testified that, on December 10, 2002, he and Jones followed their normal daily routine. The manifest sheets demonstrate that, after signing for and receiving the mail from the post office, he and Jones delivered the mail to 500 West Madison tenants, including Kemper. As a result, Kemper's affidavits are insufficient to rebut the presumption of service, given the lack of records to trace the complaint once it was delivered to Kemper's 500 West Madison office. Accordingly, Kemper was properly served.
 {¶ 35} We next must determine if the evidence supports Kemper's relief from judgment under Civ.R. 60(B). In order to prevail on a motion brought under Civ.R. 60(B), a movant must demonstrate that: (1) the party has a meritorious defense or claim to present if relief is granted; (2) the party is entitled to relief under one of the grounds stated in Civ.R. 60(B)(1) through (5); and (3) the motion is made within a reasonable time. Perry v. Gen. Motors Corp. (1996), 113 Ohio App.3d 318, citingGTE Automatic Elec. Inc. v. ARC Ind., Inc. (1976), 47 Ohio St.2d 146. Where the grounds for relief are Civ.R. 60(B)(1), (2) or (3), the motion must be made within one year after the judgment, order or proceeding was entered or taken. Id. Plaintiffs agree that Kemper may have meritorious defenses and that the motion was timely made. The trial court granted Kemper's motion on the basis of excusable neglect. The issue thus resolves to whether the circumstances surrounding Kemper's failure to timely file an answer to the complaint constitute excusable neglect under Civ.R. 60(B)(1).
 {¶ 36} Civ.R. 60(B) provides that, "[o]n motion and upon such terms as are just, the court may relieve a party * * * from a final judgment, order or proceeding for mistake, inadvertence, surprise or excusable neglect." "The term `excusable neglect' is an elusive concept which has been difficult to define and to apply. Nevertheless, we have previously defined `excusable neglect' in the negative and have stated that the inaction of a defendant is not `excusable neglect' if it can be labeled as a `complete disregard for the judicial system.'" Kay v. Glassman,Inc. (1996), 76 Ohio St.3d 18, 20, quoting GTE Automatic Elec., supra. The concept of excusable neglect must be construed in keeping with the notion that Civ.R. 60(B)(1) is a remedial rule to be construed liberally. Perry, supra. "[A] determination of excusable neglect will turn on the facts and circumstances presented in each case." Hopkins v.Quality Chevrolet, Inc. (1992), 79 Ohio App.3d 578, citing Colley v.Bazell (1980), 64 Ohio St.2d 243.
 {¶ 37} Whether to grant or deny a Civ.R. 60(B) motion is left to the sound discretion of the trial court and will not be reversed on appeal absent a showing of abuse of discretion. Id. The term abuse of discretion connotes more than an error of law or judgment; it implies the court's attitude was unreasonable. State ex rel. Lindenschmidt v. Butler Cty.Bd. of Commrs. (1995), 72 Ohio St.3d 464. Where a meritorious defense is presented and the motion is timely, doubts regarding whether excusable neglect exists should be resolved in favor of the motion so that cases can be decided on their merits. GTE Automatic Elec., supra.
 {¶ 38} Here, the trial court found that there "are a number of possible explanations which would involve excusable neglect." (Decision, at 4.) The trial court speculated that (1) the post office could have made a mistake; (2) the messenger could have lost it somehow or accidentally delivered it to the wrong office; (3) an employee who received it might have been confused about what to do with it because 500 West Madison primarily dealt with professional insurance claims, not auto insurance claims; (4) "since lawsuits were rarely served at this location, the receipt of the Complaint at that location would have been out of the ordinary that greatly increases the probability of excusable mistakes"; and (5) because plaintiffs addressed the complaint to Kemper instead of Lumbermen's, "that also increased the probability of excusable mistakes." (Decision at 5.) The trial court also found that while Kemper did not maintain a formal procedure for handling certified mail or legal service of process, "it appears that the procedures established in practice would have been adequate in most cases to insure that legal pleadings reached their appropriate destination." Id.
 {¶ 39} With respect to the possibility of a mistake by the post office or Arrow, all the evidence suggests that the complaint was lost or misplaced after it was properly delivered to Kemper's mailroom. Under the postal service's procedures, certified mail was sorted from the regular mail and signed for at a counter separate from regular mail counters; Winson had not known the postal service to make any mistakes in that aspect of its work. Winson testified that, on December 10, 2002, he and Jones followed their normal everyday procedure; during Brown's tenure since 1999, she was not aware of any errors in delivery to 500 West Madison tenants. Kemper, on the other hand, had no procedure to ensure that Arrow employees properly delivered the certified mail that was signed for, such as requiring Winson and Jones to keep a log of certified mail. The absence of such a procedure is not unexpected since Davenport, Jones, and Comeaux did not know that Arrow was authorized to sign for Kemper's certified mail.
 {¶ 40} Although Winson admitted, as he must based on common sense, that anything was possible, his testimony demonstrates that once he received the mail from the post office, he delivered it in accordance with his daily routine. Winson's and Jones' manifest sheets show that the tenants of 500 West Madison received their mail that day. To suggest that the mere possibility of error is enough to support excusable neglect would eviscerate Civ.R. 60(B).
 {¶ 41} Moreover, although Davenport and Jones testified they conducted a thorough investigation into Kemper's mail procedures and whether Kemper was served, they did not contact Maeder, the mailroom employee at the time, until months after the default judgment was entered; they did not contact Arola, Davenport's predecessor; and they did not contact the corporate office to determine if someone forwarded the certified mail.
 {¶ 42} As a result, the evidence does not support grounds for neglect based on the postal service's or an Arrow employee's mistake.
 {¶ 43} Several of the trial court's possible grounds for finding excusable neglect raise the question of whether Kemper maintained an adequate procedure for handling certified mail and legal service of process. As a general principle, "relief from default judgment may be granted on the basis of excusable neglect when service is properly made on a corporation but a corporate employee fails to forward the summons and complaint to the appropriate person." Hopkins, at 582; SycamoreMessenger, Inc. v. Cattle Barons, Inc. (1986), 31 Ohio App.3d 196
(holding relief from judgment was warranted on the basis of excusable neglect where an affidavit of an officer of the corporation demonstrated that the corporation's bookkeeper failed to forward the summons and complaint to the appropriate person). Nonetheless, a party's failure to submit a summons or any legal process to the responsible person is not automatically excusable neglect. T.S. Expediting Services, supra (finding no operative fact by affidavit or otherwise that would justify a finding of excusable neglect where the defendant was properly served).
 {¶ 44} Subsequent case law has developed a two-part test for determining whether internal corporate errors should be legally excused. For example, in Hopkins, service of process was completed by certified mail, but the defendant corporation failed to timely file an answer. A default judgment was entered against the defendant, and the defendant filed a motion for relief from judgment, arguing that it was entitled to relief under Civ.R. 60(B)(1) based on inadvertence or excusable neglect. Through the use of affidavits, the defendant's president and general counsel demonstrated that, in the ordinary course of business, all legal matters were to be referred to the general manager or the president.Hopkins, supra. The affidavits further demonstrated the defendant "had reason to believe" a former employee failed to forward the summons and complaint to his supervisor so that appropriate action could be taken. Id.
 {¶ 45} In finding excusable neglect, the Fourth District stated "[i]t is not essential that the specific identity of the person responsible for the mishap be revealed. Rather, it is sufficient to show (1) that there is a set procedure to be followed in the corporate hierarchy for dealing with legal process, and (2) that such procedure was, inadvertently, not followed until such time as a default judgment had already been entered against the corporate defendant." Id. at 583. Under similar circumstances, this court upheld a defendant's relief from judgment based on excusable neglect. See Perry v. General Motors Corp. (1996),113 Ohio App.3d 318.
 {¶ 46} In Perry, the specialized clerk signed a certified mail receipt at defendant's plant. The envelope was addressed to the corporation, not a specific individual. The clerk averred it was customary to send certified mail addressed to the corporation to the payroll department, as the corporation regularly received legal documents relating to child support or garnishment of wages. In accordance with that procedure, the clerk sent the documents to the payroll department. The supervisor of the personnel department averred that all legal matters other than child support or garnishment are supposed to be immediately forwarded to general counsel. Indeed, the defendant in Perry had a written policy in place to that effect. The payroll supervisor averred he received the complaint and summons and believed it should be forwarded to the personnel department; he was unaware of the policy to forward it to general counsel.
 {¶ 47} Addressing the issue, this court in Perry reiterated the two-part test enunciated in Hopkins and found excusable neglect under Civ.R. 60(B)(1). Perry, at 324. Because the defendant had a written procedure for handling legal matters other than child support and garnishment of wages, and affidavits demonstrated defendant's employees inadvertently failed to follow that procedure, we found the trial court did not abuse its discretion in granting defendant's motion for relief from judgment. Id.
 {¶ 48} Perry noted the concerns addressed in Sycamore Messenger andHopkins that, under a less restrictive test corporations could readily vacate default judgments. As in the cases it noted, Perry found the concern resolved by the use of affidavits containing operative facts tending to show excusable neglect. Id. at 324; Beck-Durell CreativeDept., Inc. v. Imaging Power, Inc., Franklin App. No. 02AP-281, 2002-Ohio-5908 (holding that defendant's failure to answer was due to excusable neglect under Civ.R. 60[B], using two-part Civ.R. 60[B][1] analysis, as, after receiving proper service of the complaint, the administrative assistant failed to follow the corporation's policy, albeit informal, to immediately forward legal documents to the president or vice-president).
 {¶ 49} Because the evidence does not demonstrate that either the postal service or Arrow made any mistake, Kemper is relegated to arguing that it had an adequate procedure in place for dealing with certified mail and legal service of process. Premised on that contention, Kemper also asserts that, based on the affidavits submitted, the complaint and summons undisputedly never reached the appropriate person in the corporate hierarchy. Kemper thus contends the trial court properly found any neglect to be legally excusable. To the contrary, the evidence does not support the trial court's finding.
 {¶ 50} Maeder, Brown, and Winson testified that Winson or Jones signed for Kemper's certified mail and transported the mail from the post office directly to Kemper's mailroom. Arola agreed that, if the green cards for certified mail were removed at the post office, the mail went directly from the post office to the mailroom. The trial court found this to be the mail procedure, which occurred on a daily basis. Davenport and Jones, whose positions suggest they are the two most knowledgeable individuals regarding the mail operations of Kemper's office, were unaware that any certified mail came through the mailroom: both testified that the receptionist received all certified mail. The evidence thus does not support the trial court's determination that Kemper had an adequate procedure to ensure "in most cases" certified mail was properly forwarded.
 {¶ 51} The testimony of the various Kemper employees supports that conclusion. Maeder, the one who normally received certified mail, testified that, although he received training on certified mail, he could not recall what that training involved. Instead, Maeder testified Kemper had no procedure specifying that all certified mail must go to a particular individual or individuals within the corporation. Maeder simply stated that, if he had a question about where a piece of certified mail should be directed, he asked Davenport, who testified all certified mail came through the receptionist. Jones and Davenport testified that, if Comeaux received certified mail addressed to Kemper generally, she was to give it to Jones. To the contrary, Comeaux stated that, if certified mail was addressed to Kemper generally, she sent it to the mailroom. Jones stated the policy for handling service of process was already established when he began with Kemper. Davenport thought Jones set up the policy. No one knew whether Comeaux was trained. Again, such evidence does not demonstrate that Kemper had an adequate procedure to ensure certified mail was successfully forwarded. Although an informal corporate procedure will generally suffice, Kemper simply did not demonstrate it had any certified mail procedure that was followed with any regularity. The trial court erred in finding Kemper's neglect excusable on that basis.
 {¶ 52} We recognize that other courts, without discussing the two-part test followed by this court in Perry and Beck-Durell, supra, have found excusable neglect under circumstances involving corporate employees not forwarding properly received mail to the appropriate individuals. Examples include WFMJ Television, Inc. v. ATT Federal Systems-CSC,
Mahoning App. No. 01-CA-69, 2002-Ohio-3013, and Fitz v. Continental Ins.Co., Muskingham App. No. CT2002-0023, 2003-Ohio-1815.
 {¶ 53} In WFMJ Television, the plaintiff sent the complaint and summons by certified mail; defendant did not challenge that the mailroom received the complaint and it had been properly served. Defendant, however, claimed the complaint was not properly forwarded to the appropriate department: either the mailroom employees or the employees in the billing department room failed to forward the documents to the proper department or to the supervisor of the billing room, who knew to forward it to the proper department. The billing supervisor averred "that she is to receive the rare legal correspondence sent to her department and that she never received the present correspondence." WFMJ Television, at ¶ 20. In support of its decision finding excusable neglect, the appellate court noted the "trend" in Civ.R. 60(B) cases "appears to lean toward finding that the trial court did not abuse its discretion on its decision to find excusable neglect." Id. at ¶ 21.
 {¶ 54} In Fitz, the defendant received the complaint and summons, but the documents were forwarded to the claims department in Blue Bell, Pennsylvania as opposed to the proper Chicago, Illinois office. By the time the error was noticed, the time to answer had expired. Id. The court found excusable neglect under Civ.R. 60(B)(1).
 {¶ 55} Although both of these cases do not formally discuss the two-part test, both opinions suggest a procedure was in place for dealing with certified mail and legal service of process, but that a particular employee inadvertently failed to follow the procedure. The facts before us are not the same. Kemper did not have a procedure in place to deal with certified mail after Arrow signed for it. Absent such a procedure, any number of things could have happened to the complaint and summons in this case. To allow a corporation to set aside a default judgment because the appropriate individuals claim they did not receive the complaint, even though the evidence demonstrates an inconsistent and even confusing understanding of what should have happened to the complaint and summons, is to render every corporate mistake excusable and Civ.R. 60(B) meaningless. The existence of a meritorious defense does not mean that every default judgment should be set aside. Caruso-Ciresi, Inc. v.Lohman (1983), 5 Ohio St.3d 64.
 {¶ 56} Because the evidence does not support the trial court's determination, the trial court abused its discretion in setting aside the default judgment pursuant to Civ.R. 60(B)(1). Accordingly, plaintiffs' assignment of error is sustained.
 {¶ 57} Having sustained plaintiffs' single assignment of error, we reverse the judgment of the Franklin County Court of Common Pleas and remand with instructions to reinstate the default judgment granted to plaintiffs.
Judgment reversed and case remanded with instructions.
Sadler and McCormac, JJ., concur.
McCORMAC, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.